We turn now to case number two, Approved Mortgage v. Truist Bank. Case number 22, 3163. And we're ready to hear from you. You are Mr. Vink, I believe it is. Good morning, your honors, and may it please the court. My name is Paul Vink, and I represent Approved Mortgage in this case. Approved Mortgage is asking this court to reverse the district court's dismissal of Approved Mortgage's claims on the basis of privity and preemption. In the summer of 2021, someone illegally accessed Approved Mortgage's email system and altered wire instructions for two mortgage loan payoffs. The wire instructions that went to Truist Bank contained the wrong beneficiary information. In fact, Truist Bank itself was named as the beneficiary, which was facially invalid. Second, there was a nonexistent beneficiary address. Third, there was a listed bank account that did not match the beneficiary's bank account on those wire instructions. What's more is that just eight days prior to the first of the two wire transfers at issue in this case, Truist Bank rejected a $116,000 wire transfer to the very same account because of fraud. And then, after the second transfer was allowed to go through, Truist Bank handed over $500,000 of cashier's checks to a gentleman who had traveled over 2,000 miles from Oregon to a Truist Bank branch in Arkansas. There's two sets of claims at issue that my client has brought in this case, as your honors know. Section 207 claims under Article 4A of Indiana's UCC and a common law negligence claim. The district court held that Approved Mortgage's Section 207 claims were barred because my client, Approved Mortgage, was not in privity with Truist Bank, which was the beneficiary bank in this case. Your honors, the effect of that holding is that Approved Mortgage, or MVP Title, has to sue MVP Title's bank, Bank United. But Bank United did nothing wrong here. Bank United executed a wire without any knowledge that it was inconsistent, without any knowledge that the information in that wire statement was wrong. That's information that Truist Bank knew, but not information that Bank United knew. There simply is no liability on the part of Bank United. Well, could Bank United implead Truist? Theoretically, your honor, but how do we even get there? How do I even assert a good-faith claim against Bank United, who did nothing wrong, and who has no culpability under the UCC or otherwise? Why wouldn't Bank United simply dismiss the claim? Well, but under 207, right, and you're proceeding under 207B2, and you're saying that Truist knew that there were these deficiencies, right, in the wire transfer instructions. Yes, your honor. And then B2 says, if no person has rights as beneficiary, which is what you say here, right, acceptance of the order cannot occur. Yes, your honor. And so if acceptance of the order cannot occur, don't we then go through the orderly unwind process of 402? So can't you bring a claim on Bank United under both 207 and 402 saying that, well, there's no acceptance? And so under 402, if there's no acceptance, everyone has to rewind it, and so therefore Bank United owes your client or MVP title those funds, and Bank United then has to go to the next bank along the line, Truist, to be reimbursed those funds. So, your honor, I don't believe that we would have a 402 claim or a 207 claim. We've proceeded under both 207A and 207B2, your honor. But under that theory, whenever you have most of these, a lot of these transactions of intermediary banks, right? Yes. So under that theory, there can never be an orderly rewind because the banks in the middle, as you say, quote, unquote, have no blame, and so there's no way it can be rewound as 402 suggests. Well, but, your honor, I respectfully disagree because Section 207A and 207B2 are separate, stand-alone claims under the UCC, and what those provisions say is that if there are certain criteria that are met, and we've alleged that they have been met in this case, that there needs to be that the bank can't prosecute or enforce the order that it's given, right? That's what 207A and 207B2 say. So they are wrongful acceptance claims. That's how we've described them in our briefing. Well, they're not wrongful acceptance claims. They're nullified claims. There's no acceptance at all. I mean, that's what B2 says, right? Acceptance of the order cannot occur. So as a matter of law, there's no acceptance, period. So I guess maybe it's semantics, but I don't think it's – I don't see it as wrongful acceptance. I see it as void acceptance. And I'll take that point, your honor. I think we're saying the same thing, perhaps differently. Our position is that it's a wrongful acceptance or it's acceptance that shouldn't have happened and therefore is void as a result of Section 207A and 207B2 being triggered. Here's the key in this case. We know who the wrongdoer is in this case. We know who made the mistakes in this case. It's Truist Bank. Truist Bank had the information at their disposal. They had an account that they had stopped a credit just eight days before because of fraud, and yet they allowed these to go through despite having several things wrong in the wire statements. Let me take you back in the weeds because I don't think there's much dispute that Truist messed up here. What – 207 says acceptance cannot occur under these circumstances. What, in your view, does it say the remedy should be if acceptance does not occur? What does 207 say? So 207 itself, Your Honor, does not have an explicit remedy provision, but understand the reason 207 exists is the UCC drafters created a set of rules and said if a bank accepts a wire transfer under these circumstances, it would be a draft. I want you to stick with remedy, though. Yes. Okay, so we agree 207 does not contain a remedy. Not an explicit one, Your Honor. So where then should we look for the remedy? I believe simply the fact that the UCC states in Section 207 that these things are wrong and therefore it's a wrongful acceptance or, as Judge Lee calls it, a void acceptance, whatever you want to say. In that situation, Your Honor, the remedy is simply to reimburse the funds, would be to undo the transaction, would be to hold the wrongdoer liable. I don't believe you need a separate section that says once we have declared this to be in error that you have to have a separate provision. And, Your Honor, it's important to note that there's nothing in Section 207, first of all, that says anything about privity. There's nothing in 207 that says anything about 402D being the remedy provision that you have to reach to. I think the authors of the UCC understood we are defining what's negligence in this context. I do understand your view. Why, then, do the drafters take the time in 402D, in your view, to reference 207? Because there are situations where it could be the appropriate remedy. And there are situations where – because remember what 402D is, and this is really, really important. 402D is actually for a refund claim, right? It's a particular type of remedy that you're reaching for, a refund claim. And that could be applicable in some situations. Someone could be asserting like in the Second Circuit decision we talk a lot about. You are seeking a refund. Well, we are. I would call it damages for the wrongful acceptance is what I would call it. At the end of the day, it is the same dollar amount, but I don't think it's a refund per se. It's damages for violating Section 207 of the UCC. Mr. Fink, there's a limited amount of case law in this whole problem. There are. But I suspect that in this country of ours, there's a good number of times when this problem arises. What's the industry practice? How do these things go down in the normal course of the banking industry? There are different decisions, Your Honor. I'll certainly acknowledge. No, I don't mean decisions. Practice. What's the industry practice? In terms of how banks handle these types of transactions. That's right. This happens to First Source this morning. What does First Source do? It doesn't go sue people, I'm sure. How does it handle it? So the way it normally is handled is there's an identification of is it a violation of Section 207 or some other section of the UCC or not. And oftentimes there's disputes between banks as to whether or not they have the right to accept or not accept the transaction. And then that leads to attempting to usually claw it back against another bank. And there's litigation oftentimes that unfolds if there's a difference of opinion on that. But it all starts in whether or not there's actually been wrongdoing. And based on the facts here, we believe that the record is clear that there was wrongdoing. So now the only question is, is there a privity requirement or is there not? Is there standing for my client to pursue a beneficiary bank? And in this case, it's important to understand that the Grain Traders case, which is really the key case that's cited by the other side as establishing this privity requirement. Well, two things that are key. That was a 402D case, not a Section 207 case. That's very important, right out of the gate. But secondly, the facts were completely different in that case. That case was a lawsuit against Citibank, who was an intermediary bank. So in that particular case, Grain Traders, you had this classic situation where Citibank really didn't do anything wrong. It was just stuck in the middle, and the court said, we're not going to create this environment where there's lots of different parties who can pursue different people, and it gets very confusing. And when you're dealing with intermediary banks in the middle of a very complex transaction, I'll submit I think that's the right answer. I'm not asking this court to overturn or disagree with Grain Traders. I'm saying that when you take that rule and say, ipso facto, we now have a privity rule for every single UCC claim that's brought against the bank, even a beneficiary bank who's only one step removed, who clearly did things they shouldn't have done based on what the UCC requires and based on common law negligence, which I'll get to. In that situation, the privity rule doesn't make any sense, and it creates this really perverse sense of incentives for banks, right, where they don't have any incentive to try to ferret out fraud, to try to adopt policies to stop it because they aren't going to be held liable under the situation that we have here, where you have to sue an innocent bank first. But that's the purpose of the UCC, right, is to relieve intermediary banks of that burden so that these transactions can go forward in an expeditious manner. Yes. You know, you say that there's no intermediate bank here, but the concerns raised by Grain Traders of the possibility of inconsistent judgments or multiple recoveries, that's true in cases where the originator has an originating bank, right, because in this case, there's your client, right? There's an MVP title to which you have been subrogated. Then there's Bank United, and then there's Truist. You presumably could sue both Bank United and Truist, and you'd still have these issues of inconsistent judgments or multiple recoveries. So the fact that there's no intermediary bank really doesn't address the underlying concerns that prompted the court in Grain Traders to rule as it did. I will submit to you that I think that's correct as you've identified it. The issue, though, is is the solution suing a party who had no wrongdoing, who then just dismisses the case and leaves my client without any remedy at all? That can't be the solution envisioned by the UCC. Well, then how do you address the, you know, in 402 in the comments, right, 402 comment 2, there is this scenario that the commentators point out, and the last two sentences in that first full paragraph of 2 says, The money-back guarantee is particularly important to originator if non-completion of the funds transfer is due to the fault of an intermediary bank rather than Bank A. In that case, Bank A must refund payment to the originator, and Bank A then has the burden of obtaining refund from the intermediary bank that it paid. I mean, the commentators, that's what they envisioned was this kind of step-by-step process. In a 402d context, that's right. That's what Grain Traders holds. Remember, we haven't brought a 402 claim. We brought a claim under 207a and a claim under 207b2, which is separate stand-alone claims under the UCC. And therefore, especially in the absence of any language in Section 207 that the drafters or the Indiana legislature put in there talking about a privity requirement, I don't believe that the court should be imposing one. And that's exactly what the Wheels Investments case held. That's what the judge in that case said. We're not going to adopt a new rule that wasn't contemplated by the statute itself in the absence of compelling circumstances otherwise. Sir, you're running low, and I'd really like to hear your view on this negligence claim. Yeah, thank you, Your Honor, and I am running low. I'm quickly running out of time, I recognize. Your Honor, the standard is very clear in this context, that if you are asserting negligence-based claims for things that are outside of or unrelated to the UCC itself, that that's not preempted. Were I standing here saying we are suing Truist Bank because Truist Bank negligently prosecuted wire transfers, that's preempted, no question about it. That's not our claim. We're pointing to behavior that eight days before they stopped a transaction for fraud and then did nothing with this account. That happened outside the wire transfers, had nothing to do with the wire transfers. That's about the policies and procedures that weren't followed. We're also pointing to the fact that after these transfers took place, again, completely outside of the transfers, there were, you know, I see my time's expired. Can I finish answering the question? Yes. After the transfers, we had a situation where a gentleman literally traveled over 2,000 miles to a branch in Arkansas who had no prior relationship there and withdrew over $500,000 in cashier's checks from an account that just a few days before had been marked for fraud without any sort of intervention on the part of the bank. We believe that that's outside of the UCC. There's nothing in the UCC that says that gives rise to a claim under the UCC. So, therefore, it shouldn't be preempted under the well-established standard. Thank you, Your Honors. Thank you. And now Mr. Craig. Good morning, Your Honors. The district court properly dismissed approved mortgages UCC claim because approved mortgage was not a party at all to the funds transfer in this case and its alleged assignor, MVP National Title Company, did not send any money to Truist Bank. The district court also properly dismissed approved mortgages negligence claim as preempted by the UCC. Turning to the UCC claim, as the court has discussed at some length already this morning, Section 207 does not expressly provide any remedy but only describes circumstances in which acceptance of a payment order cannot occur in the words of the code. Now, approved mortgage contends that the facts alleged in this case, which have to be assumed as true under the 12B6 standard, create a situation where acceptance of the order cannot occur. Approved mortgage, however, then goes on to contend that the UCC creates a fault-based system of remedies, and on page 16 of its brief states that Truist, quote, committed wrongdoing by its wrongful acceptance, which resulted in a loss to approved mortgage. But Section 207 never says that acceptance, when acceptance cannot occur, acceptance is wrongful. It says simply acceptance cannot occur. And so what's the consequence of acceptance not occurring? And for that, we have to turn to Section 402. So 207 does not reference 402, nor do the comments to Section 207. So what is unreasonable about approved mortgages' position that we're not compelled to go to 402 to figure out the remedy? Yes, Your Honor. The official comments to Section 207 do include references to Section 402B and 402C. Not D. Not D, that is correct. However, the official comment, comment 2 to Section 207, which the district court quoted at length in its opinion in this case, does describe the refund situation exactly as 402 would express it, and that's the case involving the mutual fund, which is through fraud induced to send the payment, I think, ultimately to Roe instead of Doe. And it's very similar to the factual setup here, where there are altered payment instructions and the transfer goes along with those altered payment instructions ultimately to the benefit of the fraudster. And in that comment 2, the drafters of the UCC write, since acceptance did not occur, originator's bank is not obliged to pay beneficiary's bank. And then the drafters go on to state, similarly, mutual fund is excused from its obligation to pay originator's bank. So in that comment, through the description of that orderly unwinding of the transaction, the drafters of, you know, in describing what happens when acceptance doesn't occur under 207, are describing the refund claim provided by Section 402. And so… Don't they know how to say C402D? Certainly, I think they do, Your Honor. And I think the references to other sections of 402 reflect that there is an intention in 207 that the parties must avail themselves of the remedy provisions in 402. So, for example, in the reference to 402B, 402B describes when acceptance occurs. And it says, with respect to a payment order issued to the beneficiary's bank, acceptance of the order by the bank obliges the sender to pay the bank the amount of the order. And so, therefore, when acceptance does not occur, that obligation does not exist. And that's described further in Section 402C and 402D. It's just that, you know, we have all these canons. And, you know, some of them say, oh, if they don't explicitly reference, drafters don't have to explicitly reference, it's fine. You can have an example. But we've got two different things going on in one section of the UCC. We've got them both explicitly referencing other portions of 402, but not 402D. So what do you default to? They knew how to reference these other two sections, but yet they didn't reference 402D. Is that intentional? Is it unintentional? I think omitting any reference specifically to the subsection D does not reflect an intent that there is some remedy outside of 402 for an alleged violation or an acceptance in violation of Section 207, exactly because as the remedy is described in Section 207, it's described exactly as 402D would unwind the transaction. That is, that the originator is not obliged to pay the originator's bank. The originator's bank is not obliged to pay the beneficiary's bank. So that, as the Second Circuit in other cases following the grain traders cases has expressed, it is the orderly unwinding of that transaction, which is especially important to avoid the multiple and inconsistent liabilities expressed by the concern expressed in the grain traders case because looking at Comment 1 to Section 207, that section states that when acceptance does not occur, quote, each sender in the funds transfer that has paid its payment order is entitled to get its money back. And so if each sender has a remedy, then unless there's this privity requirement, Truist Bank or any beneficiary's bank finds itself in the position that it The originator and the originator's bank. Okay. Let me talk about negligence while we still have time. Yes, certainly. My question is, can you identify a portion of the UCC that addresses, as adopted by the Indiana legislator, that addresses the situation, the negligence situation here, that approved especially highlights in its reply brief where the bank hands over cashier's checks to Mr. Rubiera, a half a million dollars. Okay. It would seem to me that that has very little to do with a wire transfer and is not covered by some other section of the UCC. But you tell me. Certainly, Your Honor. So the reason handing the cashier's check to AER operations registered agent does relate to the funds transfer is because once the payment order was accepted and paid, that money becomes AER operations money. And so for, you know, and that's the key to, I'm sorry, Your Honor. Go ahead. I thought you were going to ask a question. No. The key to, you know, one of the keys to funds transfers is the speed with which they occur. And that's why, you know, fraudsters frequently try to use these funds transfers. There was the classic, you know, collection scam going on against a law firm years ago where you make the transfer and then you send the check too fast to the fraudulent client. Here, it really wasn't done that speedily. I mean, the cashier's check was handed over, I think, 10 days after the first funds transfer and 5 days after the second with no objection having been lodged from MVP title or approved mortgage. But once that money is accepted, then it's AER operations money. So I think the gravamen of the plaintiff's complaint here is really we shouldn't have accepted the funds transfer and, therefore, giving the check was wrong because that shouldn't have been AER operations money. But that all goes back to whether the funds transfer was properly accepted or not. Once it was accepted, there was no basis for Truist Bank to refuse to pay the money. And, obviously, it, you know, didn't investigate the circumstances of how far Mr. Rubiero traveled or things of that nature. And it is important to note that, you know, Section 101 of Article 4A in the official comment states that resort to principles of law or equity outside Article 4A is not appropriate to create rights, duties, and liabilities inconsistent with those stated in the article. And here, what approved mortgage is really trying to do, I think both through its so-called wrongful acceptance claim and through its express negligence claim, is to say, well, the, you know, they're trying to make out of negligence Truist accepting this payment order under circumstances when it shouldn't. But, again, because that claim is barred by the UCC and the privity requirement as expressed by the drafters and interpreted through many cases, the negligence duty is simply inconsistent with that. Judge Ripple earlier asked about industry practice. The way you paused it, those are two different transactions. No, that's one seamless transaction as opposed to two different moments in time. Truist gets the wire transfer, has the money sitting at Truist. And you're saying that's the same moment in time, the same instance, or the same, we should think of it as the same transaction in which it then takes the money and converts it to cashier's checks and hands it to Mr. Rubiero. Do you have any authority for having us look at that as the same moment in time as opposed to two separate transactions? Thank you, Your Honor. And I appreciate the opportunity to explain my answer because I don't think I, I think I left a misimpression. I'm not suggesting that it's a seamless transaction. What, what I'm suggesting is once the amount is credited to AER operations account, then it's AER operations money. But what I'm, I guess what I'm asking is, that doesn't mean the bank then blindly turns it over to AER's representative when they show up. The bank has the money in house, but then aren't there procedures in place before the bank hands over cashier's checks? So, Your Honor, the, the money was, the money was credited to AER operations account shortly after the wire was made. Now I can't, I can't tell you the exact timing because we're here on a, a motion to dismiss, but these, these occur generally same day. It can depend on the time of day, whether the money gets credited or not. Some, there are some banks with, with cutoff times for those. But again, the, the, the Mr. Rubiero shows up five days after the, you know, latest funds transfer and 10 days after the first funds transfer. By that time, the money has been credited to AER operations account. So the procedure in that circumstance is to confirm that Mr. Rubiero is a person that is who he says he is. So that, those are the procedures, but those are not, those don't concern approved mortgage for the, you know, the funds transfer. Mr. Craig, in the prior instance that took place with Mr. Rubiero and AER, were the funds credited to the account before the bank then determined it was where in the process of the transaction did that take place? So candidly, Your Honor, the record doesn't disclose that. It's my understanding that the, that the transfer was, was stopped before there was a credit to the account. But because we're here on a 12B6 motion, we're simply assuming the allegations and the complaint are true. And did the allegation, the complaint say anything about that? About? I don't believe they do discuss specifically the timing and whether it was before or after the credit was made to the account. Does the complaint have any allegations about what due diligence the bank, banks should have done between the time that the account was credited versus paying out to Mr. Rubiero? It does not specifically describe what that duty would be, no. So again, in summary, Your Honor, we believe the district court properly followed the grain trader's decision to find a privity requirement and also properly found that resort to negligence here would be inconsistent with the obligations, remedies, and liabilities created by the Uniform Commercial Code. And we therefore ask that the district court's opinion be affirmed in all respects. Thank you. Mr. Vink, three minutes. Three brief points that will easily be covered in three minutes. The first one is overlooked in all of this. And I mentioned it earlier, but I think it's important to go back to the first rule of statutory construction is to look at the plain language. That's the first rule of statutory construction has been discussions about cannons of statutory construction that also favor our reading of it. But if you look at sections 207, 207A, 207B2 says nothing, nothing about a privity requirement. Even section 402 doesn't say anything about a privity requirement. I will acknowledge the second circuit has, you know, applied that. I don't want to use the term invented. That sounds pejorative. I don't mean it that way, but it is something that's not in the face of the statute. So what about the second circuit's reliance upon the article D before sender? So 402D, if the sender of a payment order, and generally in these transactions, there's more than one sender, right? And so this, one of the things the second circuit said was, well, D means one. And the only really exclusive one is the one that actually sends the payments to the particular recipient. I mean, I understand the green traders position on that. The reality is that's one. Interpretation that these, no, no, I'm just responding. I'm just kind of probing into your statement that there's no statutory textual basis for privity. Certainly the word privity appears nowhere. Can you get there through your letters, interpretation in the second circuit's interpretation? You can back your way into it with that, with that phrasing. I would contend that the word the sender is, is not nearly as clear as the word privity that clearly the drafters of the UCC understood and knew how to use if they meant that and meant for that to be applied. So that's just an important part to start with. The second point is that acceptance did occur here. There's been a lot of discussion about what the UCC says about situations where acceptance did occur here. We just got done discussing it. If the funds were credited to AER's account. So Truist Bank did accept the funds. And then the third is on the negligence claim. You have to look at this in the totality of the circumstances. What a Truist Bank is attempting to do is isolate each one of these transactions and separate them. We have an account that had $116,000 payment with undone. We don't know all the details because we haven't had a chance to do discovery, but we know that it was stopped because of fraud. Only eight days earlier, eight days earlier. And then we have a situation where only a few days later, they're handing out cashier's checks to a gentleman, 2,000 miles away. You can't simply separate all of those. You have to look at that in totality. And the reality is the UCC doesn't provide an explicit remedy for that. There's no provision. So there's no preemption. Thank you, your honors. Thank you, Mr. Craig and Mr. Vink. We'll take the case under advisement.